**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-60007-CR-SINGHAL**

**UNITED STATES OF AMERICA**

**v.**

**GAIL RUSS,**

      **Defendant.**

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States, by and through the undersigned Assistant United States Attorney, hereby files its response to the Sentencing Memorandum (DE 527) filed by defendant Gail Russ. In support of its response, the United States avers as follows:

      *1.   Defendant's Objections to the PSI Should be Overruled.*

Defendant Russ first objects to Paragraph 2 of the Pre-Sentence Investigation Report (PSI) challenging the forfeiture amount. Defendant explicitly renews the same objection she filed with respect to the United States' motion for preliminary order of forfeiture (DE 497). In response, defendant does not to cite to any case law in support of her argument that wages should not be included in the calculation of the forfeiture money judgment, but controlling Eleventh Circuit case law requires that defendant forfeit any property that she would not have obtained but for her participation in the criminal activity, including wages. *See, e.g.*, *United States v. Gladden*, 78 4th 1232, 1251 (11th Cir. 2023) (affirming forfeiture of defendant's salary received from a

compounding pharmacy when the Government showed that defendant would not have received his salary but for the fraud); *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) (applying the "but for" test; healthcare provider convicted of Medicare fraud is liable to forfeit funds she received from Medicare and the funds she received from private insurers because she would not have received either but for her fraudulent billings to Medicare).

Here, the evidence presented at trial clearly indicates that defendant would not have received wages had she and her coconspirators not participated in this widespread fraud. *See, e.g.*, Johanah Napoleon Tr. at 50 (testimony of Napoleon regarding defendant's role in issuing transcripts to students, the majority of whom did not attend classes). In fact, Napoleon testified that she continued to operate both Quisqueya and Palm Beach School of Nursing even after they had been ordered to close by the State of Florida by backdating diplomas and transcripts. *See id.* at 88. As a result, those two businesses would not have generated any revenue had Napoleon and her coconspirators, including defendant, not continued to engage in fraud after the schools were ordered to close.

Therefore, but for the criminal activity, defendant would not have received her wages, and the Court should enter the forfeiture money judgment in the amount of $862,302.00.

Defendant next challenges the assertion contained in Paragraph 14 of the PSI which merely restates the allegations of the Indictment.

Russ additionally objects to the attribution of 5,005 diplomas to her as set forth in Paragraph 32 of the PSI. In response, the PSI does not indicate Russ "processed" that number of

diplomas, but merely that the search of Palm Beach School of Nursing records revealed the roles of Napoleon and Russ in furnishing approximately 5,005 fraudulent LPN and RN degrees.

Defendant next challenges the assertion contained in Paragraph 45 of the PSI that she served as a high-level administrator to Napoleon as the Registrar and Director of Student Services for the Palm Beach School. In response, the United States observes that as Registrar, Russ was responsible for issuing most diplomas and transcripts issued by both Palm Beach School of Nursing and Quisqueya. Further, as the conspiracy continued, Napoleon's role in the day-to-day management of the fraud waned and Russ assumed the primary role in issuing fraudulent transcripts and diplomas as well as dealing with administrative boards such as boards of nursing and education commissions. *See* Napoleon Tr. at 34, 47, 55, 56, 64, 65, and 109. Russ also verified nursing applicants' attendance at Palm Beach School of Nursing at the request of nurses seeking employment after having passed the NCLEX nursing board exam. *Id*. at 56-57. Insofar as Napoleon was absent for a substantial portion of time during the period of the conspiracy, defendant acted as the principal party responsible for the furtherance of the fraudulent nursing school degree scheme thus deserving of the characterization that she acted as a high-level assistant to the school owner.

Defendant further objects to the attribution of 3,380 fraudulent diplomas to her. In response, Government's Exhibit 55 is a summary exhibit which FBI Special Agent Thomas Clark introduced at trial. This exhibit represented that based upon his review of the student files obtained from Palm Beach School of Nursing, coupled with the testimony of Napoleon and Cheryl Stanley,

Russ issued 3,380 fraudulent Palm Beach School of Nursing and Quisqueya nursing school diplomas in her role as school registrar.

Russ further questions the amount per diploma attributed to her in paragraph 45, claiming that $20,000 serves as an approximation only. Generally, "loss is the value of the money, property, or services unlawfully taken." USSG § 2F1.1 comment. (n.8). Fraud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused. *See United States v. Orton*, 73 F.3d 331, 333 (11th Cir.1996). Furthermore, because loss is often not calculable "with precision," the Court need only "make a reasonable estimate of the loss, given the available information." USSG § 2B1.1 comment. (n.3(c)); *Orton*, 73 F.3d at 335 (citation and emphasis omitted).

To further that end, the United States relies on the trial testimony of witnesses Kenneth Izuogo, Karla Minott, and others who stated that they paid $20,000 for nursing school diplomas and transcripts obtained from the Palm Beach School of Nursing. This figure serves as an appropriate measure of the financial loss attributable to defendant and her co-conspirators in this case. It follows there is adequate support in the record to substantiate the intended loss attributable to Russ and her objection in this respect should be overruled.

Defendant objects to paragraph 136 of the PSI which assesses a three-level increase for her role in the offense pursuant to USSG § 3B1(b). Specifically, Russ argues that she was merely an administrative assistant to her co-defendants Johanah Napoleon and Cheryl Stanley and therefore no upward role adjustment is applicable.

In response, a role enhancement is wholly appropriate because Russ's involvement in the fraud scheme was consistent with a manager and deserving of a three-point upward adjustment. As the Court is aware, Section 3B1.1 of the Guidelines provides for either a four or three-level increase in a defendant's offense level, respectively, if she was "an organizer or leader" or a "manager or supervisor (but not an organizer or leader)" of a "criminal activity that involved five or more participants or was otherwise extensive...." USSG § 3B1.1(a), (b). "The government must prove the existence of a leadership role by a preponderance of the evidence." *United States v. Pringle*, 571 Fed.Appx. 755, 758 (11th Cir.2014) (citing *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir.1993)). In evaluating whether this enhancement applies, courts should consider: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *Id*. (citing *United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir.2005) and USSG § 3B1.1 cmt. 4). The court may consider hearsay in making this determination if the hearsay is reliable and consistent with the other evidence of the defendant's role. *Id*.

A preponderance of the evidence shows that defendant played a managerial role in the fraudulent nursing school diploma scheme. As stated above, Russ' participation in the scheme was pervasive and integral to the success of the fraud. As Registrar, Russ was responsible for issuing 3,380 fraudulent diplomas and transcripts from both Palm Beach School of Nursing and Quisqueya. As the conspiracy continued, Russ assumed the primary role in issuing fraudulent

transcripts and diplomas as well as dealing with administrative boards such as boards of nursing and education commissions. Russ acted autonomously for a significant portion of the fraud issuing fake diplomas and transcripts as well as collecting proceeds on behalf of Johanah Napoleon. At times she acted behind Napoleon's back and retained the fees that various student brokers provided her in return for her provision of fake nursing school diplomas and transcripts. As such, she qualifies for a three-point enhancement under the guidelines given her managerial role in the offense and defendant's objection should be overruled.

Defendant broadly objects to the method by which the US Probation Office applied the guidelines in determining the intended loss in this case. In arriving at an amount of loss calculation in a fraud case, "[f]raud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused." *United States v. Gupta*, 463 F.3d 1182, 1199 (11th Cir. 2011). To that end, courts use differing methods to calculate the amount of loss depending on the nature of the fraud. *Id*. at 1200. Two of the more commonly used forms of calculation are (1) the "loss to the losing victims" method; and (2) the defendant's gain or "net gain" method. *See United States v. Bracciale*, 374 F.3d 998, 1003 (11th Cir.2004); *United States v. Gupta*, 463 F.3d at 1200. The commentary to § 2B1.1 reinforces this point, specifying that when the court cannot accurately estimate the victim's loss, it can instead use the defendant's gain for purposes of calculating the § 2B1.1(b)(1) offense level increase. U.S.S.G. § 2B1.1 cmt. n.3(B); *see also United States v. Campbell*, 765 F.3d 1291, 1297 (11th Cir. 2014). Here the US Probation Office used the "defendant's net gain method" in arriving at the loss calculation which is appropriate given the facts of this case and defendant's complaint is unavailing.

Defendant further suggests that the amount of loss was not foreseeable to her and was not within the scope of the alleged criminal activity. This argument is untenable as it relates to Russ who not only issued each of the 3,380 bogus diplomas attributed to her but also collected payments from various recruiters including Gerlada Adrien, Cassandre Jean, and others. The law allows that, under U.S.S.G. § 1B1.3(a)(1)(B), "the district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003); *see also United States v. McCrimmon*, 362 F.3d 725, 732 (11th Cir. 2004) (the entire loss caused by a money laundering scheme was properly attributed to the defendant because he "was fully aware of the objective of the conspiracy and was actively involved in recruiting investors to further the . . . scheme."); *United States v. Aguera*, 07-12950, 2008 WL 2404737 (11th Cir. June 16, 2008) (unpublished) (evidence that a patient recruiter contributed a significant number of patients to a kickback scheme, recruited accomplices, and saw the extensive list of participants in the kickback log, made him responsible for the loss for the entire conspiracy). So too here defendant Russ can thus be held responsible for the proceeds collected by her and co-conspirators working with her, including, but not limited to, co-defendants Johanah Napoleon, Cassandre Jean, Vilaire Dursoseu, Francois Leganeur, Yves St. Preux, Yvrose Thermitus, Rony Michel, Norberto Lopez, Geralda Adrien, and others.

In sum, the record amply supports the conclusion in paragraph 158 of the PSI that $67,600,000 is a reasonable calculation of loss attributable to defendant Russ pursuant to USSG § 2B1.1(b)(1)(M) and her objection should be overruled.

2.      *Defendant Should Not Be Awarded a Downward Variance or Departure.*

Lastly, defendant should not be awarded a downward variance or departure from the applicable sentencing guideline calculation. For the reasons set forth below, this Court should reject any request for a downward variance and impose a term of imprisonment within the applicable advisory guideline level.

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 330, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), courts review a defendant's sentence for reasonableness. *See United States v. Winingear*, 422 F.3d 1241, 1245 (11th Cir.2005). After Booker, a district court, in determining a reasonable sentence, must correctly calculate the advisory guidelines range and then consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Talley*, 431 F.3d 784, 786 (11th Cir.2005); *Winnegar*, 422 F.3d at 1246.   The factors set forth in § 3553(a) serve as a guide in this review.   *Id*. at 1246. Those factors include: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (4) the need to protect the public; and (5) the guideline range. *See* 18 U.S.C. § 3553(a).

Post Booker precedents emphasize that district courts must correctly calculate the advisory guideline range before granting a variance, *see United States v. Crawford*, 407 F.3d 1174, 1178 1179 (11th Cir. 2005), and that traditional guidelines departures are still an integral part of the sentencing process post Booker, *see United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005). Under this framework, defendant terms his request for a sentence less than the guideline sentence

pursuant to § 3553(a) as a variance rather than a departure. *See United States v. Scott*, 426 F.3d 1324 (11th Cir. 2005) (distinguishing between departures from the guideline range and variances pursuant to the § 3553(a) factors). A variance is a sentence outside the applicable advisory guideline range that is imposed after such range, including any departures, has been correctly calculated. *See United States v. Irizarry*, 458 F.3d 1208, 1211 12 (11th Cir. 2006).

A district court may only depart or vary from the Sentencing Guidelines when there is an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). When making this determination, the court may "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id*.

In view of these sentencing principles, a sentence within the applicable sentencing guidelines range, considering defendant's offense conduct, her personal history and circumstances, just punishment, and adequate deterrence, is reasonable. As the Booker Court noted, "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Booker*, 125 S.Ct. at 767. A sentence within the Guidelines range would satisfy one of the explicit § 3553(a) factors. *See* 18 U.S.C. § 3553(a)(4).

Defendant relies on several grounds for a downward departure or variance including her personal circumstances, lack of prior criminal record, no patient harm resulting from her conduct, and disparity in sentencing of her co-defendants. None of these grounds is availing.

Beginning with Russ's family circumstances, they are not so extraordinary as to remove her case from the heartland warranting a downward departure. Defendant invokes her care for her

adult son who has special needs. Russ' family circumstances, however, are not so extraordinary as to remove her case from the heartland warranting a downward departure. "Family ... responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S. Sentencing Guidelines Manual § 5H1.6 (2000).

Considering the facts presented, defendant's circumstances are not exceptional, but are more akin to the common collateral damage of imprisonment that many defendants encounter. The collateral effects that Russ' sentence has on her family do not distinguish his case from the many cases in which we have reversed downward departures. *See United States v. Mogel*, 956 F.2d 1555, 1565 (11th Cir.1992) (finding a woman with "two minor children to support, and a mother that lives with [her]" is not extraordinary); *United States v. Cacho*, 951 F.2d 308, 311 (11th Cir.1992) (having minor children to take care of is not extraordinary); *United States v. Allen*, 87 F.3d 1224, 1225 (11th Cir.1996) (finding that a defendant with the role of primary caretaker for his 70 year-old father with Alzheimer's and Parkinson's diseases is not extraordinary). There is nothing inherently extraordinary about caring for a child. Innocent family members, including children, commonly suffer because of a parent's incarceration. *Mogel*, 956 F.2d at 1565. Although Russ' desire to minimize the sentence's adverse effects on her family is understandable, the Court should not in turn reward defendant by departing downward. *See United States v. DeVegter*, 439 F.3d 1299 (11th Cir. 2006) (downward sentencing departure for family circumstances was not warranted, in federal wire fraud prosecution, by defendant's son's need for tutoring for dyslexia, or by mother-in-law's failing health; circumstances were not inherently extraordinary.)

Nor should her lack of criminal record warrant a deviation insofar as these factors are already considered based upon her criminal history category designation I. Russ further posits that she is entitled to a downward variance to avoid a disparity from the sentences imposed with respect to her co-conspirators, notably Johanah Napoleon. Russ dismisses the fact that most of her co-defendants pleaded guilty, received a reduction for acceptance of responsibility, and cooperated with the government in this prosecution thus accounting for their lower sentences. For example, Napoleon received a reduction in sentencing due to her substantial cooperation with law enforcement authorities and payment of a large forfeiture judgment that Judge Smith considered at the time of her original sentencing, as well as having come forward at the inception of this investigation.

Although a sentencing court is required "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), defendants who cooperate with the government are not similarly situated to a defendant who provides no assistance to the government. *See United States v. Williams*, 526 F.3d 1312, 1323–24 (11th Cir. 2008). There is no unwarranted disparity even when the sentence the cooperating defendant receives is "substantially shorter." *Id*. at 1323; *see also, e.g.*, *United States v. Docampo*, 573 F.3d 1091, 1101–02 (11th Cir. 2009) ("Because [Docampo] did not provide any assistance to the government, there was no unwarranted disparity between his and [his cooperating co-conspirators'] sentences."); *United States v. Price*, 644 F. App'x 875, 879 (11th Cir. 2016) (unpublished) ("Defendants who cooperate with the government are not similarly situated to those defendants who do not.").

11

Here it is evident that Russ' co-conspirators who received less severe sentences because of their guilty pleas and/or cooperation are not similarly situated. Because defendant occupied a managerial role in the offense, failed to accept responsibility for her criminal conduct, and did not provide the government substantial assistance, there is no "unwarranted" disparity between defendant and her accomplices' sentences.

Taken alone and together, defendant's circumstances do not qualify as an "extraordinary case" which would warrant deviation from the advisory guideline. Rather, Russ' case is ordinary and is within the "heartland," *see Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting that a departure from the Sentencing Guidelines is only appropriate if the case is outside the "heartland" of typical cases embodied by the guideline), of typical cases covered by the applicable guideline. *See, e.g., United States v. Panfil*, 338 F.3d 1299 (11th Cir.2003); *United States v. Miranda*, 348 F.3d 1322 (11th Cir. 2003).

To the contrary, defendant's stance seeking a downward variance consciously overlooks the real casualty that resulted from her actions, that is, the grave risk of harm she brought to public health nationwide. Thousands of applicants who obtained fraudulent LPN and RN degrees issued by Russ obtained certification from state boards of nursing across the United States. These applicants who were awarded licensure by unwitting state boards in fact failed to obtain the requisite training and clinical experience to satisfy the minimum standards to safely practice as nurses.

It should be without cavil that defendant's conduct contributed greatly to a significant and real risk of patient harm. Nevertheless, Russ asserts that there "was absolutely no evidence that

any nurse who received a fraudulent transcript caused any harm to any patient." *See* Defendant's Sentencing Memorandum at 7. This statement is incorrect. Co-conspirator 1, S.D., obtained a diploma and transcript issued by Palm Beach School of Nursing purporting to show that she attended Palm Beach School of Nursing and completed the necessary courses and/or clinicals to obtain an associate degree in nursing diploma. Health Care Provider-1 (HCP-1), MacIntosh, a Skilled Nursing Facility located in Ohio, employed S.D. as a licensed nurse through the staffing agency Connect RN. While working at MacIntosh, a patient under S.D.'s care died, and S.D. was fired from the facility as a result for having provided sub-standard care. *See* Government's Exhibit 47b.

In this case, it is incumbent upon the Court to send a strong, clear message to the public that such a violation of the collective trust cannot and will not be tolerated. Considering the extenuating nature of defendant's corrupt actions, a reduced sentence, as advocated by defense counsel, would absolve defendant of her egregious conduct, and provide little deterrent to like-minded offenders. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment cries out for a sentence commensurate with that advised by the Sentencing Guidelines. These factors are unquestionably legitimate and serve as a reasonable basis upon which to not vary downward from the advisory guideline range. Clearly Russ' callous actions in issuing bogus nursing school degrees to unqualified candidates borne out of greed merit severe punishment.

In sum, the record reveals nothing to indicate that the range of sentence prescribed under the Sentencing Guidelines is unreasonable considering the § 3553(a) factors, and defendant's request for a below guidelines sentence should be rejected.

### CONCLUSION

WHEREFORE, based on the foregoing, the United States respectfully requests that the Court overrule the objections to the Presentence Investigation Report and deny the request for a downward variance filed by defendant Gail Russ in the instant case.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:    /s/     Christopher    J.    Clark
CHRISTOPHER J. CLARK
Assistant United States Attorney
Florida Bar No. 0588040
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9167
christopher.clark@usdoj.gov

14

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 29, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

_____/s/ Christopher J. Clark_____
CHRISTOPHER J. CLARK
ASST. UNITED STATES ATTORNEY
